Att. 1

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

MARILYN L. GALENSKI,

Case No. 05-71441
Hon. Lawrence P. Zatkoff

        Plaintiff,

vs.

FORD MOTOR COMPANY PENSION PLAN,

        Defendant.

_____/

STEMPIEN & STEMPIEN, PLLC
By: Gregory J. Stempien (P20971)
315 N. Center St., Ste. 200
Northville, MI 48167
(248) 735-9200

Maurice G. Jenkins (P33083)
K. Scott Hamilton (P44095)
Sherry D. O'Neal (P62288)
Dickinson Wright PLLC
Attorneys for Defendant
500 Woodward Ave., Suite 4000
Detroit, MI 48226
(313) 223-3500

_____/



## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff, MARILYN GALENSKI, by and through her attorneys, STEMPIEN & STEMPIEN, PLLC, hereby files this motion for summary judgment pursuant to Rule 56 and, in support thereof, states the following:

    1.    Plaintiff filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and more specifically 29 U.S.C. 1132(a)(1)(B), 1132(c) when she was unjustifiably denied benefits by the pension program administered by

Defendant.

2.     At all relevant times Plaintiff's ex-husband, Joseph J. Galenski, (hereinafter "Mr. Galenski) was employed by Ford Motor Company and was a qualified and vested participant in Ford Motor Company Pension Plan ("the Plan").

3.     Plaintiff and her husband remained married until 1983 when a judgment of divorce was entered in Wayne County Circuit Court, which granted Plaintiff sole custody of the couple's four children and ordered Mr. Galenski to pay child support in the amount of Forty-Five ($45.00) Dollars per week per child.

4.     The Order was thereafter modified by the Wayne County Circuit Court in 1988, and directed Ford Motor Company to withhold One Hundred and Eighty ($180.00) Dollars per week from Mr. Galenski's paycheck in order to guarantee the child support payments.

5.     Mr. Galenski left his employment with Ford Motor Company on August 3, 1989.

6.     Based on the his service contributions to Ford and his benefits package, Mr. Galenski was entitled to receive pension payments once he reached the age of 55.

7.     By 1998, Mr. Galenski was still in arrears in the amount of Fifty One Thousand Two Hundred Sixty Five and 28/100 ($51,265.28) Dollars for past due child support payments and thus a Lien was perfected against his Ford Motor Company Pension for this amount by the Prosecuting Attorney for the State of Indiana on January 21, 1998.

8.     On October 11, 2001, after Mr. Galenski turned 55, an Order was entered by Wayne County Circuit Court assigning payment of the child support payments from Mr. Galenski's Ford Motor Company Pension to his ex-wife for fulfillment of his child support obligations.

gfordd.mot1.doc                                    2

9.    Later that month, Plaintiff submitted an Amended Qualified Domestic Relations Order (QDRO) to Defendant, which assigned 100% of Mr. Galenski's accrued pension benefits to Plaintiff.

10.    The proposed order was rejected by Defendant for supposedly failing to comply with the requirements of the Retirement Equity Act of 1984.

11.    Several more proposed QDRO's were submitted to Defendant, which finally accepted Plaintiff's version of the Order on January 24, 2002 and was signed and entered into the Court's records on February 11, 2002.

12.    Thereafter, both parties were informed that Mr. Galenski had died on June 13, 2001 at his home in Panama City Beach, Florida.

13.    Despite uncontradicted evidence confirming Plaintiff's entitlement to 100% of her ex-husband's pension benefits, Defendant has failed to pay all benefits accrued in accordance with the terms of the Plan.

WHEREFORE, Plaintiff MARILYN GALENSKI hereby requests this Honorable Court grant her Motion for Summary Judgment, order Defendant's denial of benefits reversed and enter an order for costs and attorney fees.

STEMPIEN & STEMPIEN, PLLC

_____
GREGORY J. STEMPIEN  P20971
Attorney for Plaintiff

Dated:  September 30, 2005

## STATEMENT OF FACTS

This case arises from the denial of pension benefits to Marilyn Galenski by Defendant Ford Motor Company Pension Plan. Beginning in 1969 Marilyn Galenski was married to Joseph J. Galenski.  In that same year, Mr. Galenski commenced employment with Ford Motor Company as an hourly worker at the carmaker's Livonia, Michigan plant.  Their marriage resulted in four children; Joe, Kevin, Scott and Meagan.  One of the terms of his employment was entitlement to a pension benefits program administered by Ford Motor Company's Pension Plan. **(A108 and A132)**     While at work, Plaintiff had primary responsibility and care for the four minor children.

After 14 years of marriage, in 1983, Mr. Galenski filed for divorce in Wayne County Circuit Court. A Default Judgment of Divorce by Withdrawal was entered on December 9, 1983 **(A002-10).**  The Judgment granted Ms. Galenski with care and custody of the four minor children; ages 4, 8, 10 and 12 at the time of divorce.  Furthermore, it was adjudged that Mr. Galenski shall pay to his ex-wife the sum of Forty Five and 00/100 ($45.00) Dollars per week per child for support of the four minor children until they children reach the age of 18.  This Order was subsequently modified on September 14, 1988 and Mr. Galenski was ordered to pay One Hundred Eighty and 00/100 ($180.00) Dollars total per week for the three youngest children who were still under the care and custody of his ex-wife **(A011)**.  This amount was ordered to be withheld from his employment paycheck at Ford Motor Company **(A013).**     Plaintiff thereafter moved to Indiana, all the while caring for her four children with minimal emotional or financial support from her ex-husband. On August 3, 1989, after nearly 20 years of service, Mr. Galenski

gfordd.mot1.doc                             4

voluntarily ended his employment at Ford Motor Company. Based on the number of years Mr. Galenski's worked at Ford, he was eligible to receive pension benefits on March 14, 2003, the date at which he turned 55. Once Mr. Galenski ended his employment at Ford, he ceased making child support payments to his ex-wife, without notice or explanation. Plaintiff struggled to make ends meet caring for her children during this period without any support from the children's father.

As a result of Mr. Galenski's failure to pay child support, the State of Indiana, on behalf of Plaintiff, filed a lien against Mr. Galenski's Ford Motor Company's Pension Plan for the sum of Fifty One Thousand Two Hundred Sixty Five and 28/100 Dollars ($51,265.28). The lien was treated as Judgment under Indiana Law and explicitly listed Mr. Galenski's last known mailing address along with the amount due and owing. (A064) Unfortunately for Plaintiff, the filing of the lien did not provoke any action by Mr. Galenski or Defendant, and the entire child support arrearage remained unpaid.

At some point following his retirement from Ford, Mr. Galenski moved to Florida and resided in Panama City Beach until his death on June 13, 2001. Plaintiff was not made aware of her ex-husband's death until nearly one year after the event. Moreover, Mr. Galenski's Pension Plan administrator, the Defendant in this action, was not aware of the death either and continued negotiating with Plaintiff regarding her entitlement to her ex-husband's pension benefits from Ford. On October 11, 2001, in the Wayne County Circuit Court, an Order was entered granting Plaintiff payment of child support from Mr. Galenski's Pension Benefits program administered by Defendant. The Order granted Plaintiff 100% of her ex-husband's benefits at Ford. Following the entry of this Order, Plaintiff worked diligently with officials at the Ford Motor

gfordd.mot1.doc                                      5

Company's Pension Plan office to agree to an Amended Qualified Relations Order.   The

Amended QRDO simply explained in more detail the principles and demands set forth in the

October 11, 2001 Order.   An Amended QDRO was eventually approved by Defendant and

entered by the Wayne County Circuit Court on February 11, 2002 **(A057).**   The delay was

attributable to both parties' repeated attempts to comply with ERISA provisions regarding

QDRO's.

Despite entering a lien and two formal QDRO's with the appropriate courts, Defendant

has failed to recognize Plaintiff's vested interest in the her ex-husband's pension fun.   It has

failed to make any benefit payments to Plaintiff, who acting as an alternate payee under ERISA.

Plaintiff became eligible to receive benefits when her ex-husband would have reached the age of

55, which is March 14, 2003 and was several months prior to his death.

## STANDARD OF REVIEW

The Sixth Circuit Court of Appeals recently set forth the standard to be applied when

reviewing a determination of pension benefits:

> As a general principle of ERISA law, federal courts
> review a plan administrator's denial of benefits de
> novo, "unless the benefit plan gives the plan
> administrator discretionary authority to determine
> eligibility for benefits or to construe the terms of
> the plan." *Wilkins v. Baptist Healthcare Sys., Inc.,*
> 150 F.3d 609, 613 (6th Cir. 1998) (*citing Firestone
> Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109
> S.Ct. 948 (1989)). When a plan administrator has
> discretionary authority to determine benefits, we will
> review a decision to deny benefits under "the highly
> deferential arbitrary and capricious standard
> of review." *Yeager v. Reliance Standard Life Ins.
> Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

*McDonald v Wester-Southern Life Insurance Company*, 347 F3d 161, 168-169 (6th Cir. 2003)

The de novo standard of review does not accord any deference to Ford Motor Company

Pension Plan's decision:

> When applying a de novo standard in the ERISA context, the role of
> the court reviewing a denial of benefits "is to determine whether the
> administrator . . . made a correct decision." *Id.* The administrator's
> decision is accorded no deference or presumption of correctness.. The
> review is limited to the record before the administrator and the court
> must determine whether the administrator properly interpreted the plan
> and whether the insured was entitled to benefits under the plan.

*Hoover v Provident Life and Accident Insurance Company*, 290 F3d 801, 808-809 (6th Cir.
2002).

Under the contract at issue **(A132 et seq)** in the case at bar, Defendant is not afforded any

discretion with respect to employee pension benefits. The supplement to the contract states:

> Your participation begins on your hire date. The company pays the full
> cost of benefits provided under the Plan.
>
> You do not have any rights to receive benefits under the Plan until you
> are eligible to retire or you are entitled to receive deferred vested
> benefits. "Vested" means you've earned a right to receive benefits from
> the Plan. "Deferred" means your benefits are payable at a later date- in
> this case, on or after age 55.
> **(A110)**

The Plan also stipulates:

> In addition to benefits provided for your retirement years, benefits may
> be payable to your spouse if you die, as long as you have completed 5
> years of Plan service or ERISA service (10 years if you don't accrue
> service after 1988).
>
> If you leave the Company before you are eligible to retire and you have
> completed at least 5 years of Plan service or ERISA service (10 years if
> you don't accrue service after 1988), you are eligible for deferred vested
> benefits.
> **(A110)**

Clearly, the language in the Plan as explained in the supplement does not give Defendant discretion to choose which employees and spouses will receive benefits upon retirement. Rather, it states that payment is automatic once an employee completes the necessary service requirements. Therefore, the Court shall review Defendant's decision to deny Plaintiff the benefits to which she was entitled *de novo*.

## ARGUMENT

This case arises under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Retirement Equity Act of 1984 ("REA"). The REA was designed to protect the financial security of ex-spouses and dependants after divorce. *See Boggs v. Boggs,* 520 U.S. 833, 845, 117 S.Ct. 1754 (1997); *Ablamis v. Roper,* 937 F.2d 1450, 1453 (9th Cir. 1991).

### Plaintiff's Qualified Domestic Relations Orders

The general provisions of ERISA state that the statute is intended to pre-empt all other existing state laws that speak to the matter of employee benefits. ERISA, however, contains an exception to the broad general rule governing preemption; the so-called "qualified domestic relations order." 29 U.S.C. § 1144(b)(7) ("QDRO"). The qualified domestic relations order provision was enacted by Congress as part of the Retirement Equity Act of 1984, Pub.L. 98-397, 98 Stat. 1426, which also provides that an "alternate payee under a qualified domestic relations order" is to be considered an ERISA plan "beneficiary." 29 U.S.C. § 1056(d)(3)(J). The primary purpose of ERISA is to protect plan beneficiaries. 29 U.S.C. §§ 1001(b), (c), 1103(c)(1), 1104(a)(1), 1108(a)(2), 1132(a)(1)(B). A nonparticipant spouse may be conferred

gfordd.mot1.doc                    8

beneficiary status if a "qualified domestic relations order" awards the spouse an interest in the beneficiary's plan. 29 U.S.C. § 1056(d)(3)(A); *Boggs,* 520 U.S. at 833. A QDRO is a limited exception to the pension plan anti-alienation provision and allows a court to recognize a non-participant spouse's community property interest in a pension plan. *Boggs,* 520 S.Ct. at 837-38. ERISA sets forth the procedures for a plan administrator to follow to determine whether or not a domestic relations order is qualified. 29 U.S.C. § 1056(d)(3)(A)-(H). In *Metropolitan Life Ins. Co. v. Marsh,* 119 F.3d 415, 421 (6th Cir.1997), the 6th Circuit held that qualified domestic relations orders that affect welfare plans, as well as pension plans, are not preempted by ERISA.

The question then remains: what qualifies as a *Qualified* domestic relations order? **29 U.S.C.A. § 1056(B-D)** clearly sets forth the requirements for QDRO's as they relate to ERISA:

> **(B)** For purposes of this paragraph--
> **(i)** the term "qualified domestic relations order" means a domestic relations order--
> **(I)** which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
> **(II)** with respect to which the requirements of subparagraphs (C) and (D) are met, and
> **(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--**
> **(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and**
> **(II)** is made pursuant to a State domestic relations law (including a community property law).
> **(C)** A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies--

gfordd.mot1.doc                                9

(i) the name and the last known mailing address (if any) of the
participant and the name and mailing address of each alternate payee
covered by the order,
(ii) the amount or percentage of the participant's benefits to be paid by
the plan to each such alternate payee, or the manner in which such
amount or percentage is to be determined,
(iii) the number of payments or period to which such order applies, and
(iv) each plan to which such order applies.
(D) A domestic relations order meets the requirements of this
subparagraph only if such order--
(i) does not require a plan to provide any type or form of benefit, or any
option, not otherwise provided under the plan,
(ii) does not require the plan to provide increased benefits (determined
on the basis of actuarial value), and
(iii) does not require the payment of benefits to an alternate payee
which are required to be paid to another alternate payee under another
order previously determined to be a qualified domestic relations order.
(emphasis added)

Plaintiff has met these requirements on three separate occasions. The first instance

occurred on January 21, 1998 when Plaintiff filed a Notice of Lien on Ford Motor Company's

Pension Plan in the State Court of Indiana for the sum of Fifty One thousand Two Hundred Sixty

Five and 28/100 ($51,265.28) Dollars **(A064)**. Plaintiff's second QDRO against Mr. Galenski

was signed entered into the Court's records on October 11, 2001 in the Circuit Court for Wayne

County, Michigan. An amended version of this same QDRO, upon approval of Defendant, was

entered into the record on February 11, 2002 **(A057)**, which constitutes the third and final

instance.

To qualify as a valid QDRO under ERISA, a domestic relations order must meet the

criteria listed explicitly in § 1056, *supra*. That criterion has been met on three separate and

distinct instances in this Ms. Galenski's case against Defendant. To require more specificity than

the statute itself requires "would defeat the purpose of the ERISA provision ..." *Metropolitan*

*Life Insurance Co. v. Marsh,* 119 F.3d 415, 422 (6th Cir.1997). Although it would be ideal that the QDRO be sufficiently detailed so that it left no questions open for interpretation, ERISA does not require such detail. *Stewart v. Thorpe Holding Co. Profit Sharing Plan,* 207 F.3d 1143 (9th Cir. 2000). *See Carland v. Metropolitan Life Ins. Co,* 935 F.2d 1114, 1119-20; *Metropolitan Life Ins. Co.* v. *Wheaton,* 42 F.3d 1080, 1084 (7th Cir. 1994) ("As long as a formula within a plan can be clearly and easily followed, courts have not hesitated to find [ERISA's] specificity requirements satisfied despite the fact that the decree calls for some modicum of interpretation.... The default position for an administrator [with regard to such interpretation] ... would be to follow ERISA and the plan's mandates."). The interpretation of "[t]hese provisions are essential to one of REA's central purposes, which is to give *enhanced protection to the spouse and dependent children in the event of divorce or separation ...." Boggs, supra.* The courts have also recognized that ERISA's QDRO provisions were enacted because "Congress was ... concerned with the inequities that might be suffered by women who are the economic victims of divorce or separation" and determined that these provisions were necessary "[t]o protect their interests." *Ablamis v. Roper,* 937 F.2d 1450, 1454 (9th Cir. 1991). For these reasons, most circuit have liberally construed the criteria by which a domestic relations order will qualify as a QDRO. *See Marsh,* 119 F.3d 415 ("While there is some disagreement over the extent to which [the Tax Code's and ERISA's] specificity requirements may be relaxed, the cases in this area all seem to allow some degree of latitude").

### 1998 Lien against Mr. Galenski's Pension Plan

The Lien filed by the State of Indiana on behalf of Marilyn Galenski against her ex-husband's Ford Pension Plan Benefits is the first document that satisfies the ERISA criteria for a

gfordd.mot1.doc                                       11

qualified domestic relations order. It satisfies all the requirements of §1056. More specifically, the Lien "assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan..." 29 U.S.C. §1056(B)(i)(I). The lien qualifies as a "domestic relations order..." because it is a "...judgment, decree, or order...which relates to the provision of child support..." 29 U.S.C. §1056(B)(ii). Paragraph 3 of the Lien states, "Joe J. Galenski is delinquent in the payment of Court-ordered child support in the amount of $51,265.28 *and this amount shall be treated as a judgment under Indiana law*." (emphasis added) **(A064)**. The only possible problem with the Lien serving as a QDRO is that it does not explicitly state the address of the alternate payee, Ms. Galenski on the face of the document as prescribed by ERISA. 29 U.S.C. §1056(C)(i). This, however, is not fatal. Child support payments are almost always administered and collected by the Friend of the Court for the Circuit Court which initially made the support order. It can be inferred from the face of the Lien that all payments related to child support payments are to be sent to the Wayne County Friend of the Court. The lien substantially complies with the remainder of the requirements and therefore must be considered a qualified domestic relations order for ERISA purposes.

In *Marsh, supra*, the Sixth Circuit held that a divorce decree, which only stated that the participant's two children were to receive two-third's of the participant's ERISA life insurance policy "substantially complied with ERISA's requirements." 119 F.3d at 422. Similar to the case at bar, the children's current mailing addresses were not included in the order. However, it did provide "the address of the mother in whose custody they were placed." *Id.* Based on this implicit assumption, the Sixth Circuit held that the address requirement was met. Finally, despite the fact that the Order failed to specify the "number of payments or periods for which

gfordd.mot1.doc                                12

such order applies," it still qualified as a QDRO under ERISA because, like Ms. Galenski's Lien against the Pension Plan, the policy contemplated one payment in full. Like the instant case, the decree lacked "no essential information" and "it [was] clear what [it] intended to be" *Id.* It therefore constituted a valid QDRO under ERISA.

## Plaintiff's Other QDRO's

Assuming arguendo that the lien filed against Mr. Galenski's pension plan does not qualify as an ERISA-compliant QDRO, Plaintiff is still entitled to receive her ex-husband's benefit payments as a result of the two QDRO's filed after Mr. Galenski's death. First, it should be noted that much of the delay in filing the QDRO's can be attributed to Defendant's failure to cooperate with Plaintiff's attorney in drafting an acceptable Order. Furthermore, neither party was aware of Mr. Galenski's death during the process of drafting the QDRO. Regardless, the Order entered October 11, 2001 and the subsequent amended QDRO entered on February, 2002 are both valid and enforceable against Defendant and thus Plaintiff is entitled to her ex-husband's pension benefit payments.

In *Hogan v. Raytheon, Co.*, 302 F.3d 854, 857 (8th Cir. 2002), the 8th Circuit held that a domestic relations order can be qualified posthumously. The fact that the participant dies "prior to the entry of the ... Order is irrelevant." *Id.* Additionally, "Under ERISA or § 414(p) of the Code, there is no requirement that a domestic relations order be prepared or submitted either at the time of divorce or at any other particular time.") Gary A. Shulman, *Qualified Domestic Relations Order Handbook* 54 (1993). In most situations where a spouse fails to file a QDRO prior to the death of the Plan Participant, a *nunc pro tunc* order is entered to relate the QDRO back to a time before the participant's death. The application of a *nunc pro tunc* order is "akin to

gfordd.mot1.doc                                          13

the correction of a clerical error." *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153 (10th Circ. 2003). [T]he very point of a *nunc pro tunc* order is the creation of a legal fiction that the order *did* exist as of the date to which it is made effective. *Id*. Although Plaintiff has not received a *nunc pro tunc* order for the QDRO in question, it is still a remedy available to her at law that would afford her 100% of her ex-husband's pension benefits as stipulated in the QDRO's.

In *Payne v. GM/UAW Pension Plan Adm'r*, No. Civ.A. 95-CV-73554DT, 1996 WL 943424 (E.D.Mich. May 7, 1996), an unpublished opinion written by Judge Bernard Friedman of this District Court, the former wife of a plan participant sought pension benefits pursuant to the terms of a divorce granting her a forty-five percent interest in her former husband's plan. ***Exhibit 1*** The Divorce Order stated that a QDRO would issue within thirty days, but the husband died well before the entry of the QDRO with the Court. Because the Order was entered posthumously, the Plan administrator maintained that the Plan did not allow for establishment of surviving spouse after the death of the participant. It argued that allowing for such would provide a benefit not otherwise provided in the plan, in violation of ERISA § 1056(d)(3)(D)(i). Counsel for the plan argued that Participant never gave notice to the administrator prior to his death and therefore an order entered posthumously would be invalid. However, the Court held that there is no provision in ERISA that demands a participant to give notice of a QDRO prior to death. The order was then amended *nunc pro tunc*, and the court held it was to be considered entered *before* the death of the participant.

The situation in Payne is analogous to Plaintiff's dilemma. The QDRO was contemplated numerous times by Plaintiff prior to her ex-husband's death. The posthumous Orders were, however, consistent with the Lien and the divorce decree ordering for the

gfordd.mot1.doc                                    14

husband's support of the couple's four children.  An amendment relating back to a time prior to Mr. Galenski's death because it was an event that was not contemplated by the parties to this suit.  In fact, neither party became aware of his death until nearly a year afterwards.  "Courts in domestic relations contexts must have the power to effect equitable settlements by responding to newly acquired information or to changes in circumstances." *Patton*, 326 F.3d at 1154. It would be a miscarriage of justice if Ms. Galenski was prevented from collecting her ex-husband's pension benefits because of a minor technicality.  She is forced into this situation by the mere fact that her husband was irresponsible and selfish in the first place.  She should not be punished for his misdeeds.

In all of this confusion, the true purpose of the ERISA statute and the Retirement Equity Act should not be forgotten.   The Retirement Equity Act was designed to protect the financial security of ex-spouses and dependants after divorce. *Boggs, supra.*  Dismissing a deserving spouse's claim because of a non-contemplated technicality would not serve the goals of this well-intentioned law.

WHEREFORE, Plaintiff MARILYN GALENSKI hereby requests this Honorable Court grant his Motion for Summary Judgment and enter an order reversing Defendant's denial of disability benefits and granting Plaintiff costs and attorney fees.

Respectfully Submitted,

STEMPIEN & STEMPIEN, PLLC

GREGORY J. STEMPIEN  P20971
Attorney for Plaintiff

Dated:  September 30, 2005

gfordd.mot1.doc                                             15

**FOR EDUCATIONAL USE ONLY**
Not Reported in F.Supp., 1996 WL 943424 (E.D.Mich.)

## Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan.
Virginia PAYNE, Plaintiff,
v.
GM/UAW Pension Plan, GM/UAW Pension Plan Administrator, and James Edmonds,
Defendants.
No. CIV.A. 95-CV-73554DT.
May 7, 1996.

Thomas R. McCombs, Esq., Flint.
David M. Davis, Esq., Birmingham.
James L. Edmonds, Esq., Grand Blanc.

OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, District J.
**\*1** This matter is presently before the court on cross motions for summary judgment. On May 2, 1996, the court held a hearing and heard oral argument. For the reasons stated below, the court shall deny defendants' motion and grant plaintiff's motion.
*Background*
In this case, plaintiff seeks pension benefits as the beneficiary of a pension plan with General Motors Corporation, where her ex-husband worked prior to his death. The case arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.*
Plaintiff Virginia Payne was married to her husband, Donald Payne, for 27 years. On February 17, 1993, they obtained a judgment of divorce from Genesee County Circuit Court (Judge Robert Ransom) in the State of Michigan. One of the terms of the divorce judgment states:

PENSION

IT IS FURTHER ORDERED AND ADJUDGED that the Defendant, VIRGINIA L. PAYNE, shall be entitled to forty-five (45%) percent of Plaintiff's pension through General Motors Corporation. A Qualified Domestic Relations Order ("QDRO") shall enter under a separate Order within thirty (30) days of the date of this Judgment of Divorce.
At the time of their divorce, Donald was working for General Motors, and he was a participant in the General Motors Hourly Rate Employees Pension Plan ("the plan"), which is administered by GM. Donald died on March 20, 1993, just one month after entry of the divorce judgment.
The QDRO called for in the divorce judgment provision quoted above was not signed by Judge Ransom until June 23, 1993, and it was not filed with the court until July 6, 1993, well after Donald Payne's death. However, Donald had signed this QDRO on February 12, 1993; and Virginia signed it on June 9, 1993. The QDRO states in ¶ 3 that Virginia is "the alternate payee." Para. 5 states that Donald "assigns a portion of

his benefits from the Plan." In accordance with the divorce judgment, ¶ 5(a) directs the plan to pay Virginia 45% of Donald's monthly retirement benefits. However, ¶ 5(d) states that "alternate payee shall not be designated as the sole surviving spouse for purposes of the Plan's pre-retirement survivor annuity benefit." And ¶ 10 states that "alternate payee shall not be designated as the sole surviving spouse for purposes of the Plan's qualified post-retirement joint and survivor annuity benefit."

> FN1. A Qualified Domestic Relations Order ("QDRO") is defined by ERISA as "a domestic relations order which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I).

Shortly after the QDRO was filed with the court, plaintiff submitted it to MetLife, which assisted GM in the administration of QDRO's, for payment of benefits. This claim was rejected in a letter dated August 2, 1993, on the following grounds:
Although the QDRO does qualify, there are no benefits due to the Alternate Payee. Inasmuch as the Participant is now deceased, the pension benefit is no longer payable. Further, the QDRO is very clear in stating that the Alternate Payee is NOT to be designated a surviving spouse. As a result, there are no benefits owed to the Alternate Payee.
**\*2** At this point Virginia obtained new counsel, Thomas McCombs, who represents her to this day. McCombs returned to Genesee County Circuit Court and filed a "Petition to Amend Qualified Domestic Relations Order." In this petition, Virginia asserted that the QDRO should be amended, nunc pro tunc, to grant her "full survivorship benefits as Alternate Payee" in order to "provide the fullfillment of the intentions of the parties." Specifically, Virginia wanted ¶¶ 5(b) and 10 amended to delete the word "not," so that as amended the QDRO would provide that she "... shall be designated the sole surviving spouse." On April 4, 1994, Judge Ransom granted this petition and entered a "nunc pro tunc order amending qualified domestic relation order" and an "amended qualified domestic relations order" which provided Virginia with the amendments she sought.
The amended QDRO was presented to the GM Pension Administration Center for payment of benefits. In a letter dated August 22, 1994, the claim was denied on the following grounds:
... this DRO is not a qualified DRO. The Pension Plan contains no provision allowing a surviving spouse to be established subsequent to the death of the Participant. To maintain actuarial soundness, no such post-death election is allowed. Prior to the Participant's death, neither the Judgment of Divorce nor prior QDRO established an intent to award the Alternate Payee any surviving spouse benefits. Thus, this DRO would contravene ERISA section 206(d)(3), which provides that a DRO is qualified only if it "(1) does not require a plan to provide any type or form of benefit or any option not otherwise provided under the plan, (2) does not require the plan to provide increased benefits (determined on the basis of actuarial value) ...
As a result, the Alternate Payee's interest in this case terminated upon the death of the Participant....
Plaintiff commenced this action in Genesee County Circuit Court in August 1995.

Defendants removed the case based on the ERISA claim. The complaint asserts two claims. Count I is directed at the plan administrator and seeks survivorship benefits based on the amended QDRO. Count II is a legal malpractice claim directed at plaintiff's prior counsel, James Edmonds, who represented her during the divorce proceedings. This claim alleges that Edmonds committed malpractice by failing to timely file the QDRO, and that this caused plaintiff to lose the survivorship benefits.
*The Cross-Motions for Summary Judgment*

The case is before the court now on cross motions for summary judgment. Defendant Edmonds is not directly involved in these motions. GM's position is that the amended QDRO should be disregarded because (1) it is inconsistent with the judgment of divorce, and (2) it violates ERISA by attempting to provide a survivor benefit that is not available under the plan. Plaintiff takes the opposite position, arguing that (1) the amended QDRO is controlling because it is consistent with the divorce judgment and reflective of the parties' intent, and (2) ERISA is not violated, because the QDRO was amended nunc pro tunc to the date of the divorce judgment, which was entered prior to Donald's death.

**\*3** Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), summary judgment should be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. See Anderson, 477 U.S. at 248-50; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478-80 (6th Cir.1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir.1990).

GM devotes the first third of its brief to a discussion of the parties' intent regarding survivorship benefits. This discussion focuses on Virginia's deposition testimony, and on documents admitted as exhibits at her deposition. This evidence shows that Virginia and Donald negotiated the terms of their divorce over a 20-month period (from June 1991 to February 1993). During this period, Virginia wanted the divorce judgment to include a provision entitling her to survivorship benefits under the plan; Donald was equally insistent that Virginia not be given this status.

This was the situation when the matter came before Judge Ransom on February 11, 1993. Apparently Donald made a concession at the hearing regarding Virginia's entitlement to a portion (45%) of his GM retirement benefits, and this is the provision, quoted above, that found its way into the divorce judgment. Judge Ransom indicated that the divorce would be granted, and the next day Donald's attorney forwarded a final draft of the judgment, and a proposed QDRO, to Virginia's attorney. Both of these documents were signed by Donald and his lawyer on February 12. Virginia and her lawyer, Edmonds, signed the divorce judgment on February 16, and Judge Ransom

signed it on February 17. The QDRO was signed by Virginia and Edmonds on June 9, and Judge Ransom signed it on June 23. Donald remarried on February 18, the same day the divorce judgment was filed. He died one month later.

*4 Virginia signed the divorce judgment on February 16, 1993. At her deposition, she testified that she reviewed the proposed QDRO at the same time, but refused to sign it because "I did not want to sign it if it was not going to give me the pension benefits I was expecting, and I wanted him [Edmonds] to be sure that it would."

As noted above, Donald died on March 20, 1993. Virginia submitted the proposed QDRO to MetLife for their opinion as to whether it would provide her with survivor's benefits, and MetLife indicated that it would not. Virginia also did her own legal research, and concluded that "this QDRO was a little flawed" because the word "not"-- in ¶¶ 5(d) and 10, that she "shall not be designated as the sole surviving spouse"-- "would ruin the whole thing." With this knowledge, Virginia nonetheless did finally sign the QDRO on June 9, 1993, and it was signed by Judge Ransom on June 23.

In its brief, GM notes the general rule that ERISA benefits cannot be assigned or alienated. 29 U.S.C. § 1056(d)(1) states: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Congress passed an exception to this "anti-alienation provision" in 1984 in the form of the Retirement Equity Act. That act allows for a limited exception, namely, when a domestic relations order provides for ERISA benefits to be shared with or assigned to a spouse. To qualify for this exception, a domestic relations order must meet certain statutory requirements and, additionally, it may not:

(i) require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) require the plan to provide increased benefits (determined on the basis of actuarial value), [or]

(iii) require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D).

GM argues that the amended QDRO fails because it violates the first of these prohibitions. GM asserts that the survivor benefits are "not otherwise provided under the plan" because this benefit "was not preserved under the Judgment of Divorce." GM's Brief, p. 14 n. 8. [FN2]

> FN2. GM denied Virginia's claim on the grounds that "the Pension Plan contains no provision allowing a surviving spouse to be established subsequent to the death of the Participant." Defendants' Exhibit J, p. 1. GM does not develop this argument in its brief, although it did raise the point again at oral argument. However, GM has not produced any plan provision to support the argument. In any event, the argument fails because Judge Ransom amended the QDRO nun pro tunc to the date of the divorce judgment (February 18, 1993), which *preceded* Donald's death.

GM's argument is circular and begs, rather than answers, the question. The issue is whether the amended QDRO is valid. The answer to this question, under the prohibition of 29 U.S.C. § 1056(d)(3)(D)(i), depends on whether the amended QDRO "require[s] a

plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." GM is arguing, if effect, that the amended QDRO would require the plan to provide benefits which are "not otherwise provided" because the QDRO is invalid (because it does not reflect the divorce judgment), and the plan only provides benefits under a valid QDRO. The problem with this argument is two-fold. First, GM does not point to a single provision *of the plan* to support its argument that the amended QDRO seeks benefits "not otherwise provided." For example, GM has not pointed to any plan provision stating that a survivor designation must be filed with the plan administrator prior to the participant's death.

**\*5** Second, GM does not cite any authority to support the proposition that a QDRO is invalid if it is inconsistent with the divorce judgment, or if it is amended after the participant's death. The two cases GM does cite, *Dickerson v. Dickerson,* 803 F.Supp. 127 (E.D.Tenn.1992), and *In re Norfleet,* 243 Ill.App.3d 925, 184 Ill.Dec. 63, 612 N.E.2d 939 (1993), are inapposite because the facts are completely different from those in the present case. [FN3]

> FN3. In *Dickerson,* the plaintiff wife sought to enforce a provision in her divorce judgment stating that she was entitled to a percentage of her ex-husband's pension benefits. She sought an immediate lump sum payout. The court denied the requested relief because the husband was not yet eligible for benefits under the plan as he was not yet 55 years old. Since he was not yet eligible, a lump sum payout to the wife would have been benefits "not otherwise provided." In the present case, GM has not shown that Virginia is attempting to obtain benefits at a time or in an amount that the plan would not otherwise provide.
>
> In *Norfleet,* the divorce judgment required the husband to pay $50,000 to his wife from his pension plan. He died before paying the full amount. The ex-wife sued the pension plan to obtain the balance. The court held that this could not be done. One of the reasons was that no QDRO was in place at the time of the husband's death, and the court did not believe she could obtain a QDRO after his death. However, the main reason for the decision was that the husband had designated his son as the sole beneficiary to the 401(k) account, and the court believed the son's interest vested irrevocably upon death. In the present case, there is no such conflict between the ex-wife and some other person claiming an interest. Donald's second wife is not eligible for any survivor benefits, and apparently is not claiming any, because she was married to Donald for less than one year.

For these reasons, the court concludes that GM has failed to show that the amended QDRO is invalid under the "not otherwise provided" prohibition of 29 U.S.C. § 1056(d)(3)(D)(i).

GM next argues that the amended QDRO is invalid because it is inconsistent with the divorce judgment. GM takes the position that (1) the divorce judgment did not provide Virginia with any survivorship rights, and (2) the amended QDRO is invalid because it purports to provide such rights, making it inconsistent with the divorce judgment. GM does not prove the first half of its argument merely by referring to the divorce

judgment itself, as the judgment is silent as to survivorship rights. The only provision in the divorce judgment regarding Virginia's rights to pension benefits is the one quoted above, which simply states that she "shall be entitled to forty-five (45%) percent of Plaintiff's pension through General Motors Corporation."

GM argues that this case is similar to *Wilterdink v. General Motors Corp.,* No. 94-CV-708 (W.D.Mich. Sept. 19, 1995), an unpublished opinion by Judge Benjamin F. Gibson. In that case, a 1976 divorce judgment awarded a portion of the husband's pension benefits to the wife, whether paid in a lump sum or in monthly installments. The husband died in 1988 before retiring. In 1994, the wife sued GM for her portion of the benefits. GM denied the claim because the divorce judgment awarded her a portion of benefits paid to the husband, and he never received any.

While the case was pending, the wife returned to the divorce court and obtained an order designating her as the surviving spouse on her husband's pension. Judge Gibson held that this order failed to accomplish the desired result because the divorce judgment "controls distribution of pension benefits" and the order did not amend the judgment. Slip op. at 6. Judge Gibson dismissed the case without prejudice to allow the wife to return to the divorce court to seek an amendment to the divorce judgment. *Wilterdink* does not assist in the analysis of the present case. The divorce judgment in *Wilterdink* specifically gave the wife *only* a portion of benefits *actually paid* to the husband. Thus, the court was justified in concluding that the judgment did not provide for survivorship rights, and that therefore the judgment would have to be amended to provide for such rights. In the present case, the judgment awards the wife "45% of [the husband's] pension," and it is not immediately clear whether this means 45% of the benefits he would eventually receive, or a 45% survivor's benefit, or both. Thus, unlike *Wilterdink,* it cannot be said that the amended QDRO is *inconsistent* with the divorce judgment; one can only say that the amended QDRO provides for survivorship rights whereas the judgment is silent on that issue. If the rule from *Wilterdink* is that a QDRO cannot make an award which is inconsistent with the divorce judgment, that rule does not apply here because there is no such inconsistency.

**\*6** GM's next case, *Dugan v. Clinton,* 1987 WL 11640 (N.D.Ill.1987), is equally inapposite. In *Dugan,* the ex-wife had a divorce judgment that awarded her "25% of the monthly benefits 'if, as, and when the husband receives same." ' When the husband died, the ex-wife sued the plan for 25% of the survivor benefits. She asked the federal district court to amend the divorce judgment to read that she was entitled to 25% of "any benefits available." The court rejected this request on the grounds that (1) it had no power to modify a state court judgment, and (2) the requested amendment to the judgment would give the ex-wife benefits "not otherwise provided," since she could not be a "surviving spouse" (apparently because she was, at most, a surviving ex-spouse). Of course, this case bears no resemblance to the present case. Virginia is not asking this court to amend the state court judgment, but to enforce a QDRO already amended by a state court. Moreover, GM is not arguing that Virginia *cannot* be a "sole surviving spouse"; GM is simply arguing that she *was not* so designated in the divorce judgment.

Finally, GM cites *Kahn v. Kahn,* 801 F.Supp. 1237 (S.D.N.Y.1992), another case that bears no resemblance to the one at bar. In *Kahn,* the husband sought, but was denied, a divorce in New York. He later moved to New Jersey, where he obtained an ex parte, no-fault divorce. When his ex-wife learned that he was retiring, she informed his plan administrator that she was invoking a statutory provision of ERISA whereby a plan participant must elect to receive annuity payments under a "joint survivor" provision. The husband had told the administrator that he wanted the annuity paid under the

"single life" option. The issue in the case was whether the husband could elect the single life option and thereby cut off his wife's survivorship rights. The answer to this question turned on whether plaintiff and defendant were still married, since the New York court denied the divorce, but the New Jersey court subsequently granted a no-fault divorce ex parte. The federal court held that the New Jersey divorce was valid; and since only the legal spouse can require a plan participant to choose the "joint survivor" option, the husband was allowed to deprive his ex-wife of any survivorship rights.

GM's citation to *Kahn* is inapposite. The present case involves a divorce judgment and QDRO which might give the wife survivorship rights under the ERISA section dealing with qualified domestic relations orders. In *Kahn*, the ex-wife was attempting to enforce a statutory right to such benefits under a different section of ERISA. GM quotes the statement in *Kahn* that "plaintiff maintained no right under ERISA to compel the [joint survivor] option upon him." 801 F.Supp. at 1244. In our case, however, Virginia is not arguing that she has a statutory right to compel Donald to make this choice; instead, she is arguing that he voluntarily made such a choice as evidenced in the divorce judgment.

**\*7** All of these cases (*Wilterdink, Dugan,* and *Kahn* ) are cited by GM in an effort to show that "the 1993 judgment of divorce did not provide plaintiff Virginia Payne with Entitlement to Survivor Benefits under the GM pension plan." However, none of the cited cases support this argument on the facts in this case.

GM's final argument is that the amended QDRO is invalid because it is inconsistent with the divorce judgment. This is a rehash of the argument made previously in GM's brief and, again, the focus is on *Wilterdink.* For the reasons explained above, *Wilterdink* is easily distinguishable from our case. GM also cites *Roth v. Roth,* 201 Mich.App. 563, 506 N.W.2d 900 (1993). In that case, the divorce judgment awarded the wife a portion of her husband's pension benefits as he received them. Years later, she asked the court to enter a QDRO stating that she would be entitled to survivor benefits. The court refused to do so on the grounds that the divorce judgment showed no intent of the parties to award such benefits. The Michigan Court of Appeals affirmed, stating that the requested QDRO could not be granted unless the divorce judgment were modified because "as written, the judgment precludes distribution of pension benefits to plaintiff until defendant begins to and only for so long as he does receive them. Defendant died before drawing any pension benefits." 201 Mich.App. at 569, 506 N.W.2d 900.

Like all of GM's other cases, reliance on *Roth* is misplaced. In *Roth,* the court indicated that the divorce judgment specifically provided only for a portion of benefits actually paid to the husband. The court also found that the judgment "precluded" payment of survivor benefits. In the present case, however, the divorce judgment does not provide Virginia with benefits only as Donald received them--the wording in the judgment is very general, saying that Virginia is entitled to 45% of Donald's pension. Unlike *Roth* and *Wilterdink,* it cannot be said that *either* QDRO (original or amended) is inconsistent with the divorce judgment. And certainly it cannot be said that the divorce judgment "precludes" survivorship benefits. Finally, *Roth* is distinguishable because in that case the ex-wife was asking the court to enter a QDRO; in the present case, the state court has already done so, and plaintiff seeks enforcement of that order.

In her response and cross motion, plaintiff argues that the first QDRO contained contradictory language concerning her survivorship rights, and that the amended QDRO simply clarified those rights. Plaintiff also argues that the plan will receive a windfall if the amended QDRO is not enforced, since in this event the plan will not have to pay any survivor benefits to anyone, as Donald's second wife was not married to

him long enough to qualify. Plaintiff further argues that the original QDRO gave her *some* survivorship rights, but failed to state specifically *the extent of* those rights.
Conclusion
***8** Having reviewed the parties' briefs, studied the cited cases, and heard oral argument, the court is persuaded that summary judgment should be granted in this matter for plaintiff. Both of defendants' arguments fail. First, defendant has failed to demonstrate that the amended QDRO will require the payment of a benefit not otherwise provided under the plan. While GM asserts that a survivor may not be designated after a participant's death, GM has not produced a plan provision so stating. Moreover, the amended QDRO was entered nunc pro tunc to a date *prior* to Donald's death. Thus, the designation was not made after death.
Second, defendant has failed to show that the amended QDRO contradicts the divorce judgment. The divorce judgment awarded plaintiff 45% of Donald's pension and was silent as to survivorship rights; and the amended QDRO specified that Virginia would receive 45% of the monthly benefits and as well as survivorship rights. GM's protestations to the contrary, there is simply no contradiction to be found between the two documents.
More importantly, to the extent there may be any inconsistency between the divorce judgment and the amended QDRO, Judge Ransom decided this issue in Virginia's favor when he granted her petition to amend the QDRO to make her the sole surviving spouse. A federal court must give full faith and credit to a state court judgment. [FN4] Whether Judge Ransom's ruling was correct or erroneous, this court is bound to respect it.

    FN4. The statutory basis for this doctrine is the Full Faith and Credit Act, 28 U.S.C. § 1738, which states in part:


    ... [J]udicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.


    A considerable body of case law holds that federal courts ordinarily must

    honor final state court judgments. *See generally* 18 C. Wright & A. Miller, *Federal Practice and Procedure* § 4469 (1981).


GM argues that the amended QDRO is a fraud on the Genesee County Circuit Court and turns the divorce judgment on its head. The answer to the complaint is that GM should have petitioned that court to vacate the amended QDRO. The amended QDRO is dated April 4, 1994. GM acknowledges that it was served with a copy "in April, 1994." GM's Motion, ¶ 9. GM could have sought relief from this order under Michigan Court Rule 2.612(C)(1)(c), which allows for a motion seeking relief from judgment within one year after entry for "fraud, misrepresentation, or other misconduct." And while GM was not a party to the divorce action, it had a right to intervene under Michigan Court Rule

2.209(A)(3). Instead, GM never took any action in state court and allowed Judge Ransom's order amending the QDRO nunc pro tunc to become a final, uncontested order of a state court of competent jurisdiction. GM has failed to offer any convincing reason why it should not be bound by that order.
For these reasons,
IT IS ORDERED that the motion of defendants GM/UAW Pension Plan and GM/UAW Pension Plan Administrator for summary judgment is denied.
IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted, and that defendants GM/UAW Pension Plan and GM/UAW Pension Plan Administrator pay plaintiff benefits in accordance with the amended QDRO.
IT IS FURTHER ORDERED that the complaint is dismissed without prejudice as to defendant Edmonds. [FN5]

> FN5. The complaint indicates that the claim against defendant Edmonds is contingent upon a finding that "the denial of benefits as claimed by the Administrator was justified and legal." Complaint, ¶ 13. The court having made a contrary determination, the claim as to Edmonds is moot.

E.D.Mich.,1996.
Payne v. GM/UAW Pension Plan
Not Reported in F.Supp., 1996 WL 943424 (E.D.Mich.)

## Motions, Pleadings and Filings (Back to top)

• 2:95cv73554 (Docket) (Sep. 01, 1995)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1

**FOR EDUCATIONAL USE ONLY**
Not Reported in F.Supp., 1996 WL 943424 (E.D.Mich.)

<u>**Motions, Pleadings and Filings**</u>

Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan.
Virginia PAYNE, Plaintiff,
v.
GM/UAW Pension Plan, GM/UAW Pension Plan Administrator, and James Edmonds,
Defendants.
No. CIV.A. 95-CV-73554DT.
May 7, 1996.

<u>Thomas R. McCombs, Esq.</u>, Flint.
<u>David M. Davis, Esq.</u>, Birmingham.
<u>James L. Edmonds, Esq.</u>, Grand Blanc.

OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, District J.
*1 This matter is presently before the court on cross motions for summary judgment. On May 2, 1996, the court held a hearing and heard oral argument. For the reasons stated below, the court shall deny defendants' motion and grant plaintiff's motion.
*Background*
In this case, plaintiff seeks pension benefits as the beneficiary of a pension plan with General Motors Corporation, where her ex-husband worked prior to his death. The case arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.*
Plaintiff Virginia Payne was married to her husband, Donald Payne, for 27 years. On February 17, 1993, they obtained a judgment of divorce from Genesee County Circuit Court (Judge Robert Ransom) in the State of Michigan. One of the terms of the divorce judgment states:

PENSION
IT IS FURTHER ORDERED AND ADJUDGED that the Defendant, VIRGINIA L. PAYNE, shall be entitled to forty-five (45%) percent of Plaintiff's pension through General Motors Corporation. A Qualified Domestic Relations Order ("QDRO") shall enter under a separate Order within thirty (30) days of the date of this Judgment of Divorce.
At the time of their divorce, Donald was working for General Motors, and he was a participant in the General Motors Hourly Rate Employees Pension Plan ("the plan"), which is administered by GM. Donald died on March 20, 1993, just one month after entry of the divorce judgment.
The QDRO [FN1] called for in the divorce judgment provision quoted above was not signed by Judge Ransom until June 23, 1993, and it was not filed with the court until July 6, 1993, well after Donald Payne's death. However, Donald had signed this QDRO on February 12, 1993; and Virginia signed it on June 9, 1993. The QDRO states in ¶ 3 that Virginia is "the alternate payee." Para. 5 states that Donald "assigns a portion of

his benefits from the Plan." In accordance with the divorce judgment, ¶ 5(a) directs the plan to pay Virginia 45% of Donald's monthly retirement benefits. However, ¶ 5(d) states that "alternate payee shall not be designated as the sole surviving spouse for purposes of the Plan's pre-retirement survivor annuity benefit." And ¶ 10 states that "alternate payee shall not be designated as the sole surviving spouse for purposes of the Plan's qualified post-retirement joint and survivor annuity benefit."

> FN1. A Qualified Domestic Relations Order ("QDRO") is defined by ERISA as "a domestic relations order which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I).

Shortly after the QDRO was filed with the court, plaintiff submitted it to MetLife, which assisted GM in the administration of QDRO's, for payment of benefits. This claim was rejected in a letter dated August 2, 1993, on the following grounds:
Although the QDRO does qualify, there are no benefits due to the Alternate Payee. Inasmuch as the Participant is now deceased, the pension benefit is no longer payable. Further, the QDRO is very clear in stating that the Alternate Payee is NOT to be designated a surviving spouse. As a result, there are no benefits owed to the Alternate Payee.
**\*2** At this point Virginia obtained new counsel, Thomas McCombs, who represents her to this day. McCombs returned to Genesee County Circuit Court and filed a "Petition to Amend Qualified Domestic Relations Order." In this petition, Virginia asserted that the QDRO should be amended, nunc pro tunc, to grant her "full survivorship benefits as Alternate Payee" in order to "provide the fullfillment of the intentions of the parties." Specifically, Virginia wanted ¶¶ 5(b) and 10 amended to delete the word "not," so that as amended the QDRO would provide that she "... shall be designated the sole surviving spouse." On April 4, 1994, Judge Ransom granted this petition and entered a "nunc pro tunc order amending qualified domestic relation order" and an "amended qualified domestic relations order" which provided Virginia with the amendments she sought.
The amended QDRO was presented to the GM Pension Administration Center for payment of benefits. In a letter dated August 22, 1994, the claim was denied on the following grounds:
... this DRO is not a qualified DRO. The Pension Plan contains no provision allowing a surviving spouse to be established subsequent to the death of the Participant. To maintain actuarial soundness, no such post-death election is allowed. Prior to the Participant's death, neither the Judgment of Divorce nor prior QDRO established an intent to award the Alternate Payee any surviving spouse benefits. Thus, this DRO would contravene ERISA section 206(d)(3), which provides that a DRO is qualified only if it "(1) does not require a plan to provide any type or form of benefit or any option not otherwise provided under the plan, (2) does not require the plan to provide increased benefits (determined on the basis of actuarial value) ...
As a result, the Alternate Payee's interest in this case terminated upon the death of the Participant....
Plaintiff commenced this action in Genesee County Circuit Court in August 1995.

Defendants removed the case based on the ERISA claim. The complaint asserts two claims. Count I is directed at the plan administrator and seeks survivorship benefits based on the amended QDRO. Count II is a legal malpractice claim directed at plaintiff's prior counsel, James Edmonds, who represented her during the divorce proceedings. This claim alleges that Edmonds committed malpractice by failing to timely file the QDRO, and that this caused plaintiff to lose the survivorship benefits.
*The Cross-Motions for Summary Judgment*

The case is before the court now on cross motions for summary judgment. Defendant Edmonds is not directly involved in these motions. GM's position is that the amended QDRO should be disregarded because (1) it is inconsistent with the judgment of divorce, and (2) it violates ERISA by attempting to provide a survivor benefit that is not available under the plan. Plaintiff takes the opposite position, arguing that (1) the amended QDRO is controlling because it is consistent with the divorce judgment and reflective of the parties' intent, and (2) ERISA is not violated, because the QDRO was amended nunc pro tunc to the date of the divorce judgment, which was entered prior to Donald's death.

**\*3** Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), summary judgment should be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. See Anderson, 477 U.S. at 248-50; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478-80 (6th Cir.1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir.1990).

GM devotes the first third of its brief to a discussion of the parties' intent regarding survivorship benefits. This discussion focuses on Virginia's deposition testimony, and on documents admitted as exhibits at her deposition. This evidence shows that Virginia and Donald negotiated the terms of their divorce over a 20-month period (from June 1991 to February 1993). During this period, Virginia wanted the divorce judgment to include a provision entitling her to survivorship benefits under the plan; Donald was equally insistent that Virginia not be given this status.

This was the situation when the matter came before Judge Ransom on February 11, 1993. Apparently Donald made a concession at the hearing regarding Virginia's entitlement to a portion (45%) of his GM retirement benefits, and this is the provision, quoted above, that found its way into the divorce judgment. Judge Ransom indicated that the divorce would be granted, and the next day Donald's attorney forwarded a final draft of the judgment, and a proposed QDRO, to Virginia's attorney. Both of these documents were signed by Donald and his lawyer on February 12. Virginia and her lawyer, Edmonds, signed the divorce judgment on February 16, and Judge Ransom

signed it on February 17. The QDRO was signed by Virginia and Edmonds on June 9, and Judge Ransom signed it on June 23. Donald remarried on February 18, the same day the divorce judgment was filed. He died one month later.

**\*4** Virginia signed the divorce judgment on February 16, 1993. At her deposition, she testified that she reviewed the proposed QDRO at the same time, but refused to sign it because "I did not want to sign it if it was not going to give me the pension benefits I was expecting, and I wanted him [Edmonds] to be sure that it would."

As noted above, Donald died on March 20, 1993. Virginia submitted the proposed QDRO to MetLife for their opinion as to whether it would provide her with survivor's benefits, and MetLife indicated that it would not. Virginia also did her own legal research, and concluded that "this QDRO was a little flawed" because the word "not"-- in ¶¶ 5(d) and 10, that she "shall not be designated as the sole surviving spouse"-- "would ruin the whole thing." With this knowledge, Virginia nonetheless did finally sign the QDRO on June 9, 1993, and it was signed by Judge Ransom on June 23.

In its brief, GM notes the general rule that ERISA benefits cannot be assigned or alienated. 29 U.S.C. § 1056(d)(1) states: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Congress passed an exception to this "anti-alienation provision" in 1984 in the form of the Retirement Equity Act. That act allows for a limited exception, namely, when a domestic relations order provides for ERISA benefits to be shared with or assigned to a spouse. To qualify for this exception, a domestic relations order must meet certain statutory requirements and, additionally, it may not:

(i) require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) require the plan to provide increased benefits (determined on the basis of actuarial value), [or]

(iii) require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D).

GM argues that the amended QDRO fails because it violates the first of these prohibitions. GM asserts that the survivor benefits are "not otherwise provided under the plan" because this benefit "was not preserved under the Judgment of Divorce." GM's Brief, p. 14 n. 8. [FN2]

> FN2. GM denied Virginia's claim on the grounds that "the Pension Plan contains no provision allowing a surviving spouse to be established subsequent to the death of the Participant." Defendants' Exhibit J, p. 1. GM does not develop this argument in its brief, although it did raise the point again at oral argument. However, GM has not produced any plan provision to support the argument. In any event, the argument fails because Judge Ransom amended the QDRO nun pro tunc to the date of the divorce judgment (February 18, 1993), which *preceded* Donald's death.

GM's argument is circular and begs, rather than answers, the question. The issue is whether the amended QDRO is valid. The answer to this question, under the prohibition of 29 U.S.C. § 1056(d)(3)(D)(i), depends on whether the amended QDRO "require[s] a

plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." GM is arguing, if effect, that the amended QDRO would require the plan to provide benefits which are "not otherwise provided" because the QDRO is invalid (because it does not reflect the divorce judgment), and the plan only provides benefits under a valid QDRO. The problem with this argument is two-fold. First, GM does not point to a single provision *of the plan* to support its argument that the amended QDRO seeks benefits "not otherwise provided." For example, GM has not pointed to any plan provision stating that a survivor designation must be filed with the plan administrator prior to the participant's death.

**\*5** Second, GM does not cite any authority to support the proposition that a QDRO is invalid if it is inconsistent with the divorce judgment, or if it is amended after the participant's death. The two cases GM does cite, *Dickerson v. Dickerson,* 803 F.Supp. 127 (E.D.Tenn.1992), and *In re Norfleet,* 243 Ill.App.3d 925, 184 Ill.Dec. 63, 612 N.E.2d 939 (1993), are inapposite because the facts are completely different from those in the present case. [FN3]

> FN3. In *Dickerson,* the plaintiff wife sought to enforce a provision in her divorce judgment stating that she was entitled to a percentage of her ex-husband's pension benefits. She sought an immediate lump sum payout. The court denied the requested relief because the husband was not yet eligible for benefits under the plan as he was not yet 55 years old. Since he was not yet eligible, a lump sum payout to the wife would have been benefits "not otherwise provided." In the present case, GM has not shown that Virginia is attempting to obtain benefits at a time or in an amount that the plan would not otherwise provide.

> In *Norfleet,* the divorce judgment required the husband to pay $50,000 to his wife from his pension plan. He died before paying the full amount. The ex-wife sued the pension plan to obtain the balance. The court held that this could not be done. One of the reasons was that no QDRO was in place at the time of the husband's death, and the court did not believe she could obtain a QDRO after his death. However, the main reason for the decision was that the husband had designated his son as the sole beneficiary to the 401(k) account, and the court believed the son's interest vested irrevocably upon death. In the present case, there is no such conflict between the ex-wife and some other person claiming an interest. Donald's second wife is not eligible for any survivor benefits, and apparently is not claiming any, because she was married to Donald for less than one year.

For these reasons, the court concludes that GM has failed to show that the amended QDRO is invalid under the "not otherwise provided" prohibition of 29 U.S.C. § 1056(d) (3)(D)(i).

GM next argues that the amended QDRO is invalid because it is inconsistent with the divorce judgment. GM takes the position that (1) the divorce judgment did not provide Virginia with any survivorship rights, and (2) the amended QDRO is invalid because it purports to provide such rights, making it inconsistent with the divorce judgment. GM does not prove the first half of its argument merely by referring to the divorce

judgment itself, as the judgment is silent as to survivorship rights. The only provision in the divorce judgment regarding Virginia's rights to pension benefits is the one quoted above, which simply states that she "shall be entitled to forty-five (45%) percent of Plaintiff's pension through General Motors Corporation."

GM argues that this case is similar to *Wilterdink v. General Motors Corp.,* No. 94-CV-708 (W.D.Mich. Sept. 19, 1995), an unpublished opinion by Judge Benjamin F. Gibson. In that case, a 1976 divorce judgment awarded a portion of the husband's pension benefits to the wife, whether paid in a lump sum or in monthly installments. The husband died in 1988 before retiring. In 1994, the wife sued GM for her portion of the benefits. GM denied the claim because the divorce judgment awarded her a portion of benefits paid to the husband, and he never received any.

While the case was pending, the wife returned to the divorce court and obtained an order designating her as the surviving spouse on her husband's pension. Judge Gibson held that this order failed to accomplish the desired result because the divorce judgment "controls distribution of pension benefits" and the order did not amend the judgment. Slip op. at 6. Judge Gibson dismissed the case without prejudice to allow the wife to return to the divorce court to seek an amendment to the divorce judgment. *Wilterdink* does not assist in the analysis of the present case. The divorce judgment in *Wilterdink* specifically gave the wife *only* a portion of benefits *actually paid* to the husband. Thus, the court was justified in concluding that the judgment did not provide for survivorship rights, and that therefore the judgment would have to be amended to provide for such rights. In the present case, the judgment awards the wife "45% of [the husband's] pension," and it is not immediately clear whether this means 45% of the benefits he would eventually receive, or a 45% survivor's benefit, or both. Thus, unlike *Wilterdink,* it cannot be said that the amended QDRO is *inconsistent* with the divorce judgment; one can only say that the amended QDRO provides for survivorship rights whereas the judgment is silent on that issue. If the rule from *Wilterdink* is that a QDRO cannot make an award which is inconsistent with the divorce judgment, that rule does not apply here because there is no such inconsistency.

**\*6** GM's next case, *Dugan v. Clinton,* 1987 WL 11640 (N.D.Ill.1987), is equally inapposite. In *Dugan,* the ex-wife had a divorce judgment that awarded her "25% of the monthly benefits 'if, as, and when the husband receives same." ' When the husband died, the ex-wife sued the plan for 25% of the survivor benefits. She asked the federal district court to amend the divorce judgment to read that she was entitled to 25% of "any benefits available." The court rejected this request on the grounds that (1) it had no power to modify a state court judgment, and (2) the requested amendment to the judgment would give the ex-wife benefits "not otherwise provided," since she could not be a "surviving spouse" (apparently because she was, at most, a surviving ex-spouse). Of course, this case bears no resemblance to the present case. Virginia is not asking this court to amend the state court judgment, but to enforce a QDRO already amended by a state court. Moreover, GM is not arguing that Virginia *cannot* be a "sole surviving spouse"; GM is simply arguing that she *was not* so designated in the divorce judgment.

Finally, GM cites *Kahn v. Kahn,* 801 F.Supp. 1237 (S.D.N.Y.1992), another case that bears no resemblance to the one at bar. In *Kahn,* the husband sought, but was denied, a divorce in New York. He later moved to New Jersey, where he obtained an ex parte, no-fault divorce. When his ex-wife learned that he was retiring, she informed his plan administrator that she was invoking a statutory provision of ERISA whereby a plan participant must elect to receive annuity payments under a "joint survivor" provision. The husband had told the administrator that he wanted the annuity paid under the

"single life" option. The issue in the case was whether the husband could elect the single life option and thereby cut off his wife's survivorship rights. The answer to this question turned on whether plaintiff and defendant were still married, since the New York court denied the divorce, but the New Jersey court subsequently granted a no-fault divorce ex parte. The federal court held that the New Jersey divorce was valid; and since only the legal spouse can require a plan participant to choose the "joint survivor" option, the husband was allowed to deprive his ex-wife of any survivorship rights.

GM's citation to *Kahn* is inapposite. The present case involves a divorce judgment and QDRO which might give the wife survivorship rights under the ERISA section dealing with qualified domestic relations orders. In *Kahn,* the ex-wife was attempting to enforce a statutory right to such benefits under a different section of ERISA. GM quotes the statement in *Kahn* that "plaintiff maintained no right under ERISA to compel the [joint survivor] option upon him." 801 F.Supp. at 1244. In our case, however, Virginia is not arguing that she has a statutory right to compel Donald to make this choice; instead, she is arguing that he voluntarily made such a choice as evidenced in the divorce judgment.

**\*7** All of these cases (*Wilterdink, Dugan,* and *Kahn* ) are cited by GM in an effort to show that "the 1993 judgment of divorce did not provide plaintiff Virginia Payne with Entitlement to Survivor Benefits under the GM pension plan." However, none of the cited cases support this argument on the facts in this case.

GM's final argument is that the amended QDRO is invalid because it is inconsistent with the divorce judgment. This is a rehash of the argument made previously in GM's brief and, again, the focus is on *Wilterdink.* For the reasons explained above, *Wilterdink* is easily distinguishable from our case. GM also cites *Roth v. Roth,* 201 Mich.App. 563, 506 N.W.2d 900 (1993). In that case, the divorce judgment awarded the wife a portion of her husband's pension benefits as he received them. Years later, she asked the court to enter a QDRO stating that she would be entitled to survivor benefits. The court refused to do so on the grounds that the divorce judgment showed no intent of the parties to award such benefits. The Michigan Court of Appeals affirmed, stating that the requested QDRO could not be granted unless the divorce judgment were modified because "as written, the judgment precludes distribution of pension benefits to plaintiff until defendant begins to and only for so long as he does receive them. Defendant died before drawing any pension benefits." 201 Mich.App. at 569, 506 N.W.2d 900.

Like all of GM's other cases, reliance on *Roth* is misplaced. In *Roth,* the court indicated that the divorce judgment specifically provided only for a portion of benefits actually paid to the husband. The court also found that the judgment "precluded" payment of survivor benefits. In the present case, however, the divorce judgment does not provide Virginia with benefits only as Donald received them--the wording in the judgment is very general, saying that Virginia is entitled to 45% of Donald's pension. Unlike *Roth* and *Wilterdink,* it cannot be said that *either* QDRO (original or amended) is inconsistent with the divorce judgment. And certainly it cannot be said that the divorce judgment "precludes" survivorship benefits. Finally, *Roth* is distinguishable because in that case the ex-wife was asking the court to enter a QDRO; in the present case, the state court has already done so, and plaintiff seeks enforcement of that order.

In her response and cross motion, plaintiff argues that the first QDRO contained contradictory language concerning her survivorship rights, and that the amended QDRO simply clarified those rights. Plaintiff also argues that the plan will receive a windfall if the amended QDRO is not enforced, since in this event the plan will not have to pay any survivor benefits to anyone, as Donald's second wife was not married to

him long enough to qualify. Plaintiff further argues that the original QDRO gave her *some* survivorship rights, but failed to state specifically *the extent of* those rights.
Conclusion

**\*8** Having reviewed the parties' briefs, studied the cited cases, and heard oral argument, the court is persuaded that summary judgment should be granted in this matter for plaintiff. Both of defendants' arguments fail. First, defendant has failed to demonstrate that the amended QDRO will require the payment of a benefit not otherwise provided under the plan. While GM asserts that a survivor may not be designated after a participant's death, GM has not produced a plan provision so stating. Moreover, the amended QDRO was entered nunc pro tunc to a date *prior* to Donald's death. Thus, the designation was not made after death.

Second, defendant has failed to show that the amended QDRO contradicts the divorce judgment. The divorce judgment awarded plaintiff 45% of Donald's pension and was silent as to survivorship rights; and the amended QDRO specified that Virginia would receive 45% of the monthly benefits and as well as survivorship rights. GM's protestations to the contrary, there is simply no contradiction to be found between the two documents.

More importantly, to the extent there may be any inconsistency between the divorce judgment and the amended QDRO, Judge Ransom decided this issue In Virginia's favor when he granted her petition to amend the QDRO to make her the sole surviving spouse. A federal court must give full faith and credit to a state court judgment. [FN4] Whether Judge Ransom's ruling was correct or erroneous, this court is bound to respect it.

> FN4. The statutory basis for this doctrine is the Full Faith and Credit Act, 28 U.S.C. § 1738, which states in part:

> ... [J]udicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.

> A considerable body of case law holds that federal courts ordinarily must

> honor final state court judgments. *See generally* 18 C. Wright & A. Miller, *Federal Practice and Procedure* § 4469 (1981).

GM argues that the amended QDRO is a fraud on the Genesee County Circuit Court and turns the divorce judgment on its head. The answer to the complaint is that GM should have petitioned that court to vacate the amended QDRO. The amended QDRO is dated April 4, 1994. GM acknowledges that it was served with a copy "in April, 1994." GM's Motion, ¶ 9. GM could have sought relief from this order under Michigan Court Rule 2.612(C)(1)(c), which allows for a motion seeking relief from judgment within one year after entry for "fraud, misrepresentation, or other misconduct." And while GM was not a party to the divorce action, it had a right to intervene under Michigan Court Rule

2.209(A)(3). Instead, GM never took any action in state court and allowed Judge Ransom's order amending the QDRO nunc pro tunc to become a final, uncontested order of a state court of competent jurisdiction. GM has failed to offer any convincing reason why it should not be bound by that order.

For these reasons,

IT IS ORDERED that the motion of defendants GM/UAW Pension Plan and GM/UAW Pension Plan Administrator for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted, and that defendants GM/UAW Pension Plan and GM/UAW Pension Plan Administrator pay plaintiff benefits in accordance with the amended QDRO.

IT IS FURTHER ORDERED that the complaint is dismissed without prejudice as to defendant Edmonds. [FN5]

> FN5. The complaint indicates that the claim against defendant Edmonds is contingent upon a finding that "the denial of benefits as claimed by the Administrator was justified and legal." Complaint, ¶ 13. The court having made a contrary determination, the claim as to Edmonds is moot.

E.D.Mich.,1996.
Payne v. GM/UAW Pension Plan
Not Reported in F.Supp., 1996 WL 943424 (E.D.Mich.)

### Motions, Pleadings and Filings (Back to top)

• 2:95cv73554 (Docket) (Sep. 01, 1995)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

MARILYN L. GALENSKI,

            Plaintiff,

vs.

FORD MOTOR COMPANY PENSION PLAN,

       Defendant.

_____/

Case No. 05-71441
Hon. Lawrence P. Zatkoff

| STEMPIEN & STEMPIEN, PLLC | Maurice G. Jenkins (P33083) |
|---|---|
| By: Gregory J. Stempien (P20971) | K. Scott Hamilton (P44095) |
| 315 N. Center St., Ste. 200 | Sherry D. O'Neal (P62288) |
| Northville, MI 48167 | Dickinson Wright PLLC |
| (248) 735-9200 | Attorneys for Defendant |
| | 500 Woodward Ave., Suite 4000 |
| \ | Detroit, MI 48226 |
| | (313) 223-3500 |

_____/

**PROOF OF SERVICE**

STATE OF MICHIGAN   )
                 ) ss.
COUNTY OF WAYNE   )

      Shawn L. Barrows, being first duly sworn, states that she served a copy of Plaintiff's Motion for Summary Judgment by placing the document in a postage prepaid envelope and depositing the envelope in the United States mail in Northville, Michigan on Saturday, October 1, 2005 addressed to:

                  Sherry D. O'Neal, Esq.
                  c/o Dickinson Wright, PLLC
                  500 Woodward Avenue, Suite 4000
                  Detroit, Michigan  48226

                  _____
                  Shawn L. Barrows

Subscribed and sworn to before me this 1st day of October, 2005

_____

Gregory J. Stempien, Notary Public
Wayne County, Michigan
My Commission Expires:  12/05/2011

ggalenmpl.pos1.doc