UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARILYN L. GALENSKI,   CASE NO. 05-CV-71441-DT
                      HON. LAWRENCE P. ZATKOFF

    Plaintiff,

vs.

FORD MOTOR COMPANY PENSION PLAN,

    Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on March 17, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's "Motion for Summary Judgment" (Docket #6).[1] Defendant jointly filed a response to Plaintiff's Motion for Summary Judgment and a Counter-Motion for Affirmation of ERISA Administrative Decision (Docket #8). Plaintiff has filed a reply to Defendant's response and Counter-Motion and Defendant has filed a sur-reply. The Court finds that the facts and legal arguments pertinent to Plaintiff's Motion and Defendant's Counter-Motion are adequately presented in the parties' papers, and the decisional process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that Plaintiff's Motion and Defendant's Counter-Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Plaintiff's Motion for Summary Judgment (Docket #6) is GRANTED and Defendant's Counter-Motion (Docket #8) is DENIED.

---

[1] Defendant correctly notes that summary judgment motions are not the appropriate procedural mechanism in actions involving the denial of ERISA-governed benefits. In this case, the Court treats the parties' motions as cross-motions to reverse (Plaintiff) and affirm (Defendant) the administrative decision denying Plaintiff benefits, as was discussed at the scheduling conference held in this case.

## II.  BACKGROUND

In 1969, Joseph Galenski ("Mr. Galenski") and Plaintiff married, and the couple had four children.  Mr. Galenski also began working for Ford Motor Company ("Ford") as an hourly worker in 1969.  One of the terms of Mr. Galenski's employment was entitlement to a pension benefits program (the "Plan") administered by Defendant.

In 1983, Mr. Galenski filed for divorce and a Default Judgment of Divorce by Withdrawal was entered which: (1) granted Plaintiff care and custody of the four minor children, and (2) provided that Mr. Galenski would pay Plaintiff $45/week for each child until he or she reached the age of 18.  The Default Judgment was modified in 1988 to provide that Mr. Galenski would pay $180/week for the three remaining minor children and such amount was to be withheld from his paycheck at Ford.  The Order Modifying Default Judgment of Divorce also provided that "any income due [Mr. Galenski] from any source shall be remitted to the Friend of the Court" and income means "commissions, earnings, salaries . . . and other income due now or in the future from an employer . . . a profit-sharing plan, pension plan [or] insurance contract[.]"  Thus, pursuant to the Order, Plaintiff is an alternate payee of Mr. Galenski's retirement benefits.  Plaintiff subsequently moved to Indiana.

On August 3, 1989, after approximately 20 years of service for Ford, Mr. Galenski voluntarily terminated his employment.  As a result of his service, Mr. Galenski was eligible to begin receiving pension benefits on March 14, 2003 (his 55th birthday).  Once Mr. Galenski ceased working for Ford, he stopped making child support payments to Plaintiff.  By 1998, he owed Plaintiff approximately $51,000 in back child support.  The State of Indiana, at the request of and on behalf of Plaintiff, filed a lien against Mr. Galenski's interest in the Plan for $51,265.28 in January 1998 (the "Indiana lien").  Mr. Galenski died on June 13, 2001, although neither party was aware of his death until nearly one year later.  Mr. Galenski never paid the back child support he owed.

Plaintiff and Defendant began negotiations regarding Plaintiff's entitlement to Mr.

Galenski's pension benefits in February 1998. After years of exchanging proposed qualified domestic relations orders ("QDROs") that would satisfy the terms of the Plan, Plaintiff and Defendant entered a QDRO in Wayne County Circuit Court on October 11, 2001 (the "Initial QDRO"). Under the terms of he Initial QDRO, Plaintiff was entitled to 100% of Mr. Galenski's benefits under the Plan in order to pay for the child support arrearage owed by Mr. Galenski. Thereafter, the parties worked out an amended qualified domestic relations order and it was entered in Wayne County Circuit Court on February 11, 2002 (the "Amended QDRO"). Defendant agreed that the Amended QDRO was acceptable because it met the requirements of the Retirement Equity Act of 1984 ("REA"), and the Plan's provisions.

Soon after the Amended QDRO was entered, however, the parties learned that Mr. Galenski had died in June 2001. On March 26, 2002, Defendant wrote Plaintiff that the "pension benefit ceased to be payable at the time of [Mr. Galenski's] death." On August 7, 2003, Fidelity Investments, the administrator of the Plan (the "Administrator"), communicated to Plaintiff that the "pension benefit ceased to be payable at the time of [Mr. Galenski's] death," and that she was eligible only to a "surviving spouse benefit," which consisted of a significantly smaller payment each month.

Thereafter, Defendant and/or the Administrator repeatedly instructed Plaintiff or her counsel that (1) she would need to file an application in order to receive payment of the surviving spouse benefits (the only benefits Defendant believed Plaintiff was entitled to under the Plan), (2) she was not entitled to "supplemental, temporary and post-retirement increases," and (3) she would not be entitled to her surviving spouse benefit until the date [Mr. Galenski] would have been eligible for early retirement." Plaintiff never completed an application for benefits or sent any letter appealing the Defendant's interpretation of the Amended QDRO. Instead, on April 13, 2005, Plaintiff commenced the instant action seeking a reversal of Defendant's determination that she was not entitled to the retirement benefits for which Mr. Galenski was eligible under the Plan.

### III. LEGAL STANDARD

In reviewing an administrative decision denying benefits, a district court is to look solely to the evidence and material that was contained in the administrative record at the time the administrative decision was made. *Wilkins v. Baptist Healthcare Systems, Inc.,* 150 F.3d 609 (6th Cir. 1998). *See also Miller v. Metropolitan Life Ins.*, 925 F.2d 979, 984 (6th Cir. 1900) ("when reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made.").   The *Wilkins* court then stated,

> As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.

*Wilkins*, 150 F.3d at 619.

In the event the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, an arbitrary and capricious standard of review is applied rather than the de novo standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550 (6th Cir. 1998)(*en banc*).  In the instant case, the language of the Plan gives the administrator discretion to interpret the language of the Plan and determine eligibility for retirement benefits:

> The Board shall have jurisdiction to pass upon all questions concerning the application or interpretation of the provisions of the Plan which it is empowered to administer.  After review of an appeal, the disputed benefits under the Plan will be paid only if the Board decides in its discretion that the employee or claimant is entitled to them under the terms of the Plan.  The Board shall decide all such questions in accordance with the Plan, and all such decisions of the Board shall be final and binding upon the Company, the Union, the employees, and the beneficiaries of claimants under the Plan, subject only to the arbitrary and capricious standard of review[.]

\* \* \* \* \*

> The Board shall have such powers as are necessary for proper administration of the Plan, including the following: . . . (b) To make findings of facts and determinations as to the rights of any employee applying for retirement benefits, and to afford any such individual dissatisfied with any such findings or determinations the right to a hearing thereon . . . [and] (d) To obtain from the Company, from the Union, and from employees such information as shall be necessary for proper administration of the Plan.

## IV. ANALYSIS

Plaintiff filed the instant case in this Court pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002 *et seq.* ("ERISA"), as amended by the REA. The primary purpose of ERISA is to protect plan beneficiaries. The purpose of the REA amendment was to protect the financial security of ex-spouses and dependents after a divorce. *Boggs v. Boggs*, 520 U.S. 833, 845 (1997). In order to facilitate the purpose of the REA, former spouses can obtain a QDRO under which the former spouse becomes an "alternate payee" under a benefit plan and is then treated as a plan beneficiary for the purpose(s) set forth in the QDRO. 29 U.S.C. § 1056(d)(3)(J); *Boggs*, 520 U.S. at 843. A QDRO is a limited exception to the pension plan anti-alienation provisions and allows a court to recognize a non-participant spouse's community property interest in a pension plan. *Boggs*, 520 U.S. at 837-38.

### A.   Timing of the QDROs

The QDRO requirements under ERISA are set forth at 29 U.S.C. §1056(B)-(D). Defendant does not dispute that Plaintiff submitted an acceptable proposed pension QDRO in February 2002 when the Amended QDRO was entered. Defendant does not address Plaintiff's contentions that appropriate QDROs were also filed in January 1998 (via the Indiana lien) and October 2001 (the Initial QDRO). Defendant contends, however, that because the Amended QDRO was not received until after Mr. Galenski's death, Plaintiff was not entitled to any benefits from the Plan because the pension benefit ceased to be payable at his death. The Court disagrees with Defendant, as the evidence on the record demonstrates that a valid QDRO was in place prior to Mr. Galenski's death..

First, the Court finds that the Indiana lien constituted an acceptable QDRO for pension

purposes pursuant to 29 U.S.C. § 1056(B)-(D). The failure of the lien to specify the address of Ms. Galenski (the alternate payee) on the face of the document is not critical, *see Metropolitan Life Ins. Co. v. Marsh*, 119 F.3d 415, 422 (6th Cir. 1997), and the Indiana lien fulfilled the other required elements. Second, even if the Indiana lien did not constitute a valid QDRO, Defendant was immediately notified of the Indiana lien, and Plaintiff presented Defendant with a proposed Plan-conforming QDRO on March 31, 1998. Defendant and Plaintiff then spent four years working on a document that would constitute an "acceptable" QDRO under the terms of the Plan. As such, Defendant knew of the Indiana lien and the need to get a conforming QDRO for purposes of the Plan more than three years before Mr. Galenski died (*see, e.g.,* footnote 2 below). The fact that the parties spent nearly four years putting together a document acceptable to Defendant as they tried to agree on what, in essence, were clerical issues does not serve to obviate the existence of a QDRO that conformed to the requirements of federal law. As such, the Court finds that the parties had agreed upon a QDRO with respect to what was eventually filed as the Amended QDRO years before Mr. Galenski died.

Despite Defendant's assertions to the contrary, the Court finds no provisions in ERISA that require that the QDRO be entered prior to the death of the participant. Many other courts have reached the same conclusion and caused an order to be entered making the QDRO effective *nunc pro tunc* to a date prior to the death of the participant. *See, e.g., Payne v. GM/UAW Pension Plan Adm'r*, 1996 WL 943424 (E.D. Mich., May 7, 1996) (finding that there was no provision in ERISA that requires a participant give notice of a QDRO prior to death and providing for a *nunc pro tunc* order where divorce order provided for issuance of a QDRO within 30 days but husband died before it was entered); *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153 (10th Cir. 2003) (allowing a *nunc pro tunc* order to relate the QDRO back to a time before the participant's death); *Hogan v. Raytheon, Co.*, 302 F.3d 854, 857 (8th Cir. 2002) (QDRO entered posthumously as the participant's death "prior to the entry of the . . . Order is irrelevant").

Accordingly, for the reasons stated above, the Court concludes that Plaintiff provided

Defendant with an acceptable QDRO prior to the death of Mr. Galenski and that the timing of the QDRO does not operate as a bar to Plaintiff's entitlement to pension benefits under the Plan. In addition, the Court ORDERS the parties to, within 30 days of the date of this Opinion and Order, enter into and file with the Wayne County Circuit Court an amendment to the Amended QDRO that provides that the Amended Order shall be effective, *nunc pro tunc*, as of June 1, 2001.

The Defendant also has made statements that may be interpreted as meaning that even if a QDRO was in place prior to Mr. Galenski's death, Plaintiff's right to pension benefits extinguished at the time of Mr. Galenski's death. For example, on March 26, 2002, Defendant wrote Plaintiff that the "pension benefit ceased to be payable at the time of [Mr. Galenski's] death." In addition, a subsequent communication from Defendant's QDRO Unit on June 11, 2002, stated that Plaintiff was not entitled to "supplemental, temporary and post-retirement increases," but it appears that statement of non-entitlement was based on the fact that Mr. Galenski had died prior to a QDRO being entered. The absence of any sustained argument or citation to the underlying documents by Defendant, together with internal communications between Defendant representatives,[2] leads the Court to conclude that Defendant would not have denied Plaintiff the pension benefits if it had an "acceptable" QDRO in its hands prior to Mr. Galenski's death.

**B.      QDROs Do Not Limit Plaintiff to Pre-Retirement Surviving Spouse Benefits**

Defendant contends that "[p]ursuant to the language of the Plaintiff's QDRO, as well as the express language and terms of the Plan, **Plaintiff is not entitled to receive anything more than pre-retirement surviving spouse benefits**, regardless of when she submitted her QDRO (Admin. R. A163-164, 182)" (Defendant's emphasis). The Court has reviewed the documents submitted by

---

[2] In an email dated March 21, 2002, Marilee Craig emailed Marianne Delaney that she "[w]as just about to qualify a QDRO for [Mr. Galenski]. It awards the [Plaintiff] 100% of the Pension. . . . Here's the problem, as we were talking he mentioned that [Mr. Galenski] had died . . . What do we do with the QDRO since it was filed after his death. . . . What so [sic] we do now. Does she not get anything because the QDRO was entered after death, or is allowed, since they have been attempting to get one entered since 2000." On the basis of this exchange, Defendant clearly would have paid the pension benefits had the QDRO been entered prior to his death.

7

the parties in this case and is unable to ascertain any language which would support that statement. Neither the Indiana lien, the Initial QDRO nor the Amended QDRO filed in Wayne County Circuit Court include language that limits Plaintiff's recovery to pre-retirement surviving spouse benefits. To the contrary, the Amended QDRO specifically provides that Plaintiff is entitled to "Post-Retirement Surviving Spouse Benefits."

Accordingly, the Court concludes that the Plan and the QDROs do not limit Plaintiff's entitlement to pre-retirement surviving spouse benefits.

**C.  Filing an Application for Benefits Would Have Been Futile**

Defendant strenuously argues that, even if an acceptable QDRO existed, Plaintiff never submitted the completed application (with all of the requisite accompanying documents) which is required to become eligible for retirement benefits. Plaintiff admits that she never completed an application for benefits from the Defendant.

Generally, the "administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit." *Miller v. Metropolitan Life Ins.*, 925 F.2d 979, 986 (6th Cir. 1990). Defendant notes that the purpose of the exhaustion requirement is to "enable[] plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." In certain circumstances, however, the administrative exhaustion principles may not apply:

> Although ERISA's administrative exhaustion requirement for claims brought under [29 U.S.C.] §502 is applied as a matter of judicial discretion, a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate.

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). *See also Constantino v. TRW Inc.*, 13 F.3d 969 (6th Cir. 1994). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." *Fallick*, 162 F.3d at 419.

In the instant case, the Court finds that it would have been futile for Plaintiff to submit an

8

application to Defendant. Defendant had informed Plaintiff, in writing, on several occasions that she was not entitled to any pension benefits, only pre-retirement surviving spouse benefits. The two most significant communications were: (1) the letter from Marilee Craig in the QDRO Unit on March 26, 2002 (stating that because the QDRO was not approved until after Mr.Galenski's death, Plaintiff "is not entitled to any benefits from the Plan. The pension benefit ceased to be payable at the time of the Participant's death."), and (2) the letter prepared by the Administrator on August 7, 2003 (the "pension benefit ceased to be payable at the time of [Mr. Galenski's] death," and Plaintiff was eligible only to a "surviving spouse benefit," which consisted of a significantly smaller payment each month). Those communications unequivocally set forth Defendant's position and gave a "clear and positive indication" that any application filed by Plaintiff would be futile.

In addition, the Court finds that the purpose of the exhaustion requirement would not be compromised by holding Plaintiff to filing a completed application in this case. Defendant has been on notice of this matter for years, so Defendant could have managed its funds with this matter in mind. To the extent Defendant did not do so likely stems from its adamant, yet baseless, position that Plaintiff was not entitled to pension benefits. Because of Defendant's unyielding position, the Court believes that requiring Plaintiff to file a completed application would have been useless and had no bearing on Defendant correcting its errors or interpreting plan provisions in a different manner. As this case demonstrates, Defendant would not alter its position short of a lawsuit being filed and losing. Finally, the Court does not see how a completed application would have assisted the Court's review of the fiduciaries actions in this case.

For the reasons stated, the Court holds that Plaintiff's failure to file a completed application with Defendant does not bar her entitlement to pension benefits pursuant to the Indiana lien or the Amended QDRO (as it will be amended *nunc pro tunc* in accord with this Opinion).

**D.     No State Law Claims**

Defendant asserts that Plaintiff's claims are state law claims, that state law claims are pre-empted by ERISA and that Defendant is entitled to judgment as a matter of law. The Court agrees

with the parties that ERISA is intended to pre-empt all existing state laws that speak to the matter of employee benefits. 29 U.S.C. § 1944(a). In addition, as the parties note, if the essence of a claim is to recover an ERISA plan benefit, it is pre-empted by ERISA no matter what label is given to the claim. *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991). Plaintiff inexplicably defends its "state law" claims and contends that they are not pre-empted because QDROs are an exception to ERISA pre-emption. The Court says "inexplicably" because Plaintiff filed this action in federal court on the basis of ERISA and did not assert any state law claims. The allegations and the substance of the Plaintiff's Complaint are rooted in ERISA and the Plan. The fact that Plaintiff inartfully titled Counts II and III of the Complaint as "Breach of Contract" and "Undue Delay in Processing" does not transform the allegations into state law claims.

Accordingly, the Court rejects Defendant's contention that it is entitled to judgment as a matter of law on Plaintiff's claims because of ERISA pre-emption.

**E.     Defendant Acted Arbitrarily and Capriciously**

Defendant argues that the Court's review of this matter is limited to determining whether it acted arbitrarily and capriciously in denying Plaintiff benefits under the Plan because Plaintiff failed to submit a completed application. The Court finds that Defendant has oversimplified the issue by assuming that it would have made a difference if Plaintiff had submitted a completed application. As discussed above, the Court concludes that the submission of an application would not have made a difference because Defendant was and remains firmly entrenched in its belief that Plaintiff is not entitled to benefits because no QDRO was received prior to Mr. Galenski's death..

The Court therefore addresses the real issue in this case, *i.e.,* whether Defendant acted arbitrarily and capriciously in denying Plaintiff's entitlement to benefits. As noted above, (1) there are no provisions in ERISA that require a QDRO to be entered prior to the participant's death, (2) a decision in this district has adopted the same position, (3) the Indiana lien was entered over three years before the participant's death and that lien constituted a valid QDRO under federal law, (4) Defendant was aware of the Indiana lien and engaged in years of negotiating to get the QDROs to

be filed in Wayne County Circuit Court to conform to the language of the Plan, (5) Defendant would have paid on Plaintiff's claim if Defendant had received the QDRO before Mr. Galenski's death, (6) the purpose of the REA is to protect the financial security of ex-spouses and dependents after divorce, and (7) the circumstances of this case epitomize the purpose behind the REA.

Accordingly, the Court concludes that the Defendant acted arbitrarily and capriciously in denying Plaintiff benefits because Defendant communicated to Plaintiff a position (*i.e.,* that Plaintiff is not entitled to benefits because the QDRO allegedly was not received until after Mr. Galenski's death) that had no basis in fact or law.  The Court therefore reverses the Defendant's denial of pension benefits to Plaintiff and holds that Plaintiff is entitled to 100% of Mr. Galenski's accrued pension benefits.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, Plaintiff's "Motion for Summary Judgment" is GRANTED and Defendant's Counter-Motion for Affirmation of ERISA Administrative Decision is DENIED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  March 17, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on March 17, 2006.

s/Marie E. Verlinde
Case Manager

(810) 984-3290